IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Case No: _____

| | |
|---|---|
| **ALISANOS, LLC,** § | |
| § | |
| *Plaintiff*, § | |
| § | |
| v. § | |
| § | **Jury Trial Demanded** |
| **MEDTRONIC, INC.,** § | |
| § | |
| *Defendant* § | |
| § | |

## ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Alisanos LLC ("Alisanos" or "Plaintiff") alleges for its Complaint against Defendant Medtronic, Inc. ("Medtronic" or "Defendant") as follows:

1. This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. The Court's jurisdiction over this action is proper under the Title 35, including 35 U.S.C. § 271, *et seq.*, and under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1338 (jurisdiction over patent actions).

### THE PARTIES

2. Plaintiff **Alisanos LLC** is a limited liability company duly organized and existing under the laws of the State of Texas that maintains its principal place of business in Longview, Texas. Alisanos owns all rights and title to United States Patent No. 6,592,573 ("the '573 Patent").

3. Defendant **Medtronic, Inc.,** is a corporation organized and existing under the laws of the State of Minnesota with its principal place of business at 710 Medtronic Parkway, Minneapolis, Minnesota 55432. Medtronic may be served via its registered agent, CT Corporation System, 1200 S. Pine Island Road, Plantation, FL 33324-4413.

## BACKGROUND AND NATURE OF THE ACTION

4. In 1998, Medicanica, Inc. ("Medcanica"), a Florida corporation, was formed to research and develop next-generation medical devices, specifically focusing on safer, less invasive surgical tools for some of the most serious and dangerous of surgical procedures.

5. The principals of Medcanica also created a specialized affiliate to Medcanica, Inc., an entity called POPCAB, LLC ("POPCAB"), a Florida limited liability company, to focus on the research and development of instruments for closed chest surgery that would limit invasiveness without sacrificing efficacy. Accordingly, the name "POPCAB" was chosen as an acronym for "port off-pump coronary artery bypass." One of the primary purposes of POPCAB, LLC was to hold all of the intellectual property related to closed chest surgical devices and the techniques and practices that would be developed by the Medcanica/POPCAB team, including intellectual property that would become the '573 Patent.

6. The '573 Patent is titled **"Through-Port Heart Stabilization System."** A true and correct copy of the '573 Patent is attached hereto as **Exhibit A**. While working for Medcanica/POPCAB, Javier E. Castañeda, Jose Luis Francese, Matthew A. Palmer, and Ralph de la Torre invented a new and non-obvious heart-stabilization device that was designed to work primarily with the coronary artery. The four Medcanica inventors assigned their invention to POPCAB. On June 27, 2001, POPCAB filed patent application number 09/893,099 as a

continuation-in-part of patent applications that had been filed in October and December of 2000. On July 15, 2003, the United States Patent and Trademark Office granted the '573 Patent.

7. Through a series of assignments, Alisanos acquired and now holds all rights, title, and interest to the '573 Patent.

8. While the '573 Patent was pending, Medcanica began looking for a business partner to assist in the development of this cutting edge technology. Medicanica's business goals were two fold: 1) Obtain the capital necessary to continue its already substantial research, design, and development of its planned surgical devices and technology; and 2) Gain access to distribution and marketing networks that the right type of partner could provide.

9. In late 2000, Medicanica/POPCAB engaged Medtronic, a multi-billion dollar corporation that manufactures, uses, markets, and sells pacemakers, defibrillators, stents, catheters, and surgical tools, in hopes of finding a business partner to fit their vision. This engagement led to the extensive sharing, under confidentiality agreements, of Medicanica/POPCAB's proprietary information, including the confidential pending patent applications that ultimately resulted in the '573 Patent.

10. On or around June 22, 2000, Medcanic/POPCAB, entered into an Agreement for Mutual Exchange of Confidential Information with Medtronic whereby the parties could safely share proprietary information without the fear of that information being made public. Under that agreement the parties Medcanica gave Medtronic detailed information regarding the "POPCAB Procedure," which included detailed descriptions of the exact technology and patent applications that would eventually form the basis of the '573 Patent. Furthermore, the importance of protecting the parties' current patents and/or pending patent applications was specifically outlined in this agreement. This agreement preserved Medcanica/POPCAB's exclusive right to

and interest in its proprietary information and granted no right to Medtronic to the use of Medcanica/POPCAB's proprietary information. The information shared under this confidentiality agreement ultimately resulted in a business relationship between the parties.

11. After several meetings and discussions, Medtronic and Medcanica entered into a business agreement on or around April 27, 2001. Under that agreement, Medtronic assisted in funding Medcanica/POPCAB's efforts to develop the aforementioned technology. In turn, Medtronic received the option to obtain an ownership interest commensurate with its investments, or to purchase POPCAB (which held the Intellectual Property rights to the patented technology) outright for approximately sixty-two-and-a-half-million dollars ($62,500,000.00). Specifically, Medtronic agreed to an upfront payment and several milestone payments to be made during the course of researching, designing, and developing the patented technology. Each of these milestone payments was to be triggered by Medcanica's successful completion of pre-defined stages of product development. With the agreement executed, Medtronic made its initial payment of five-hundred thousand dollars ($500,000), and Medcanica continued to develop the products upon which the parties' business relationship was founded.

12. While the relationship between Medtronic and Medcanica started on good terms it quickly soured. Around May of 2001, Medcanica completed its first product development milestone, and Medtronic reciprocated with its first milestone payment of five-hundred-thousand-dollars ($500,000). Medcanica met its second development milestone around October 2001, and again Medtronic made the required payment of five-hundred-thousand-dollars ($500,000). However, when Medcanica completed the third milestone, Medtronic balked at meeting its corresponding obligation under the agreement and refused to make the required payment. Rather than pay the seven-hundred-fifty-thousand dollars ($750,000) as was required

under the agreement, Medtronic took the first step toward terminating the parties' agreement. This decision was made only after Medtronic had gained an intimate knowledge of not only what would become the patented technology's design on paper, but also how it could be developed in practice. Claiming surprise by the fast pace of Medcanica's progress in developing the cutting-edge products, Medtronic expressed a desire to renegotiate the agreement and refused to make the third milestone payment.

13. Soon thereafter, the relationship between Medcanica and Medtronic came to an end. The original agreement was terminated and Medcanica spearheaded discussions of possible alternative relationships. During these talks in late 2001, the parties signed another confidential disclosure agreement ("CDA") under which Medcanica provided Medtronic with copies of its patent applications, including the '573 Patent, in an attempt to convey the mutual benefit of continuing their relationship. In response, Medtronic claimed that while it did not believe the patents would issue, it would be willing to consider paying a royalty.

14. By the end of 2001, the business relationship between Medcanica and Medtronic came to an end. All rights and obligations under the original agreement were terminated and no further information was shared under the CDA.

15. The parties had no further communication until 2004, after the '573 patent had issued, when Medcanica gave Medtronic a second chance to evaluate the patents and discussed continuing their previously successful business relationship. After once again receiving full access to all of the Medcanica patents, including the '573 Patent, Medtronic decided to walk away again.

16. By 2003, Medcanica had run out of financing to further its product development. Without Medtronic or a replacement partner, there was no business relationship to help finance

its research and product development. Likewise, the once promising upstarts were without ready-access to distribution and marketing channels, even if product development could resume.

17. On July 30, 2003, William "Bill" Box, the founder of Medcanica, Inc., established a new Florida-based company called Medcanica, LLC.

18. In November 2003 POPCAB, LLC transferred all of its assets to Medcanica, Inc. and was dissolved and in December 2003. Medcanica, Inc. then transferred all of its assets to Bill Box and was dissolved. Mr. Box eventually transferred all of the assets, including the '573 Patent, to Medcanica, LLC.

19. Medcanica was later introduced to Alisanos LLC a small Texas-based company whose primary purpose involves intellectual property development and licensing. Alisanos and Medcanica, LLC discussed a potential business relationship, and the '573 Patent along with other intellectual property was assigned to Alisanos. Currently Alisanos owns all rights, title, and interest to the '573 Patent, the Patent-in-Suit.

20. Unbeknownst to Medcanica, while it was winding up its businesses, Medtronic was developing a surgical device that is remarkably similar to some of the devices designed and developed by Medcanica. One such device is the Octopus Evolution AS tissue stabilizer device. The similarity of the Octopus Evolution AS device and the surgical devices developed by Medcanica are such, that Alisanos contends that the Octopus Evolution AS device infringes at least one claim of the '573 Patent. The similarities are so great that Alisanos contends that any other Medtronic devices that are similar to the Octopus Evolution AS will likewise infringe one or more claims of the '573 Patent.

21. Accordingly, Plaintiff Alisanos, LLC as owner of all right, title, and interest to the '573 Patent brings this action against defendant Medtronic and accuses Medtronic of past and

ongoing direct, indirect, and willful infringement of the '573 Patent. Alisanos contends that Medtronic's infringement has been willful and is ongoing. By this action, Alisanos seeks to put a stop to the Medtronic's illegal conduct and obtain compensation for Medtronic's past, ongoing, and willful infringement of the '573 Patent. Medtronic, worth billions of dollars and employing thousands of people, should not be allowed to continue using Alisanos' patented technology without Alisanos' permission and without justly compensating Alisanos. Medtronic has benefitted from its unauthorized past and ongoing use of Alisanos' inventions.

**PERSONAL JURISDICTION AND VENUE**

22.  On information and belief, Medtronic designed, developed, manufactured, used, distributed, offered to sell, and/or imported into the United States the tissue stabilizer devices including but not limited to the Octopus Evolution AS. On information and belief, Medtronic recruited and induced others such as consumers, businesses, distributors, resellers, sales representatives, hospitals, medical institutions, group purchasing organizations, physicians, and medical professionals to sell, offer to sell, and/or use Medtronic tissue stabilizer devices including but not limited to the Octopus Evolution AS. On information and belief, Medtronic has in the past and continues to promote, distribute, and/or actively encourage the sale and use of Medtronic tissue stabilizer devices including but not limited to the Octopus Evolution AS to consumers, businesses, distributors, resellers, sales representatives, hospitals, medical institutions, group purchasing organizations, physicians, and medical professionals for sale and use throughout this division, this judicial district, the State of Florida, and the United States. This Court has personal jurisdiction over Medtronic because it, by and through its employees, sales representatives, and other agents, has committed and continues to commit acts of direct infringement, contributory infringement, and/or inducement of infringement within the State of

Florida and within this District, and places infringing products into the stream of commerce, with the expectation, knowledge, and/or understanding that such products are used, offered for sale, and/or sold in the State of Florida, including in this District. The acts by Medtronic caused injury to Alisanos within this District. On information and belief, Medtronic has in the past and continues to derive revenue from the use, offer for sale, and/or sale of goods and services including but not limited to the infringing products in the State of Florida and within this District; induces acts of infringement in the State of Florida and within this District; solicits and/or transacts business in the State of Florida and within this District; attempts to derive financial benefit from residents of the State of Florida including the residents of this District; expects their actions to have consequences in the State of Florida and within this District; and/or derives substantial revenue from interstate and international commerce. On information and belief, Medtronic has sufficient minimum contacts within the forum and does substantial, continuous and systematic business in the State of Florida, including the Southern District of Florida, and has purposefully directed activities to residents of the State of Florida. Thus, Medtronic has purposefully availed itself of the benefits of the State of Florida and the exercise of jurisdiction over Medtronic would not offend traditional notions of fair play and substantial justice.

23. This action for patent infringement arises under the patent laws of the United States, Title 35 of the United States Code. The Court's jurisdiction over this action is proper under the above statutes, including 35 U.S.C. § 271, *et seq.*, 28 U.S.C. § 1331 (federal question jurisdiction), and § 1338 (jurisdiction over patent actions).

24. Venue is proper in this Court under 28 U.S.C. § 1391(b), (c), and (d), as well as 28 U.S.C. § 1400(b), for the reasons set forth above and herein. A substantial part of the events

and omissions giving rise this claim, as described above, occurred in this District. Additionally, Medcanica, LLC, which sold and assigned the '573 Patent to Plaintiff Alisanos was formed in and continues to be headquartered in the Southern District of Florida. The owner and founder of Medcanica, John William "Bill" Box, has and continues to reside in this District. The inventors of the '573 Patent are former employees of or consultants to Medcanica, Inc., and/or POPCAB, LLC, and performed their research and other employee obligations in this District. The majority of the inventors have and continue to reside in this District. Around 2001, Defendant Medtronic negotiated and interacted with Florida-based Medcanica, Inc., and POPCAB, LLC in this District and all payments made under the agreement between the parties were made to Medcanica and/or POPCAB in this District. Medtronic has committed acts of direct and indirect infringement of the '573 Patent in this District Upon information and belief, Medtronic has committed and/or induced acts of patent infringement as described above in this District.

## ALISANOS'S ASSERTED PATENT

25. Alisanos incorporates and realleges the allegations contained in paragraphs 1 through 24 above as if fully set forth herein.

26. Through this civil action, Alisanos asserts direct, indirect, and willful infringement and inducement of infringement of one or more claims of the '573 Patent, entitled "Through-Port Heart Stabilization System."

27. The '573 Patent was duly and legally issued by the U.S. Patent and Trademark Office to named inventors Javier E. Castañeda, Jose Luis Francese, Matthew A. Palmer, and Ralph de la Torre on July 15, 2003 after full and fair examination. The '573 Patent issued from U.S. Patent Application Serial No Application No. 09/893,099 filed on June 27, 2001.[1]

---

[1] The application that resulted in the '573 Patent (Application No. 09/893,099) is a continuation-in-part of Application No. 09/686,696, filed on October 11, 2000, now U.S. Patent No. 6,464,691, and a continuation-in-part

28. Alisanos is the owner as assignee of all rights, title, and interest in and under the '573 Patent.

29. Alisanos has standing to sue for infringement of the '573 Patent.

30. Alisanos does not currently manufacture or sell any products embodying any claims of the '573 Patent and thus, no marking is currently required.

## COUNT I

## MEDTRONIC'S DIRECT INFRINGEMENT OF THE '573 PATENT

31. Alisanos incorporates and realleges paragraphs 1 through 30 above as if fully set forth herein.

**32.** Defendant Medtronic is liable for infringing one or more claims of the '573 Patent. Medtronic has not obtained permission from Alisanos to make, use, offer to sell, sell, or import products, systems, or methods incorporating the inventions in the '573 Patent.

33. Defendant Medtronic has infringed and continues to infringe (literally and/or under the doctrine of equivalents) one or more claims of the '573 Patent by making, using, selling, offering to sell, and/or importing tissue stabilizer devices including but not limited to the Octopus Evolution AS ("Accused Devices"). For example only and not as a limitation, Plaintiff contends that the Accused Devices directly infringe at least claim 24 of the '573 Patent as well as other claims, because the Accused Devices are heart stabilization devices that embody every element of claim 24, as well as other claims. Medtronic's infringing uses include, but are not limited to, using the Accused Devices for testing, demonstration, marketing, surgical, and/or other purposes. Medtronic's infringing activities include manufacturing in the United States

---

of Application No. 09/686,530, filed on October 11, 2000, now U.S. Patent No. 6,464,690, and a continuation-in-part of Application No. 09/733,493, filed on December 8, 2000, and a continuation-in-part of Application No. 09/733,498, filed on December 8, 2000, and a continuation-in-part of Application No. 09/733,503, filed on December 8, 2000, now U.S. Patent No. 6,355,028, and a continuation-in-part of Application No. 09/741,387, filed on December 20, 2000.

and/or importing the Accused Devices to the United States.  Medtronic also infringes the '573 Patent by selling and offering to sell the Accused Devices directly and via sales representatives, distributors, and resellers to consumers, businesses, distributors, resellers, sales representatives, hospitals, medical institutions, group purchasing organizations, physicians, and medical professionals.  Medtronic's infringement of the '573 Patent has caused substantial damage to Alisanos.  Medtronic's infringing activities violate 35 U.S.C. § 271. Medtronic's direct infringement of the '573 Patent has been and remains willful.

## COUNT II

## MEDTRONIC'S WILLFUL INFRINGEMENT

34. Alisanos incorporates and realleges the allegations paragraphs 1 through 33 above as if fully set forth herein.

35. Defendant Medtronic committed its acts of infringement willfully and without license or authorization from Alisanos or from Medcanica/POPCAB.  For example and without limitation, on information and belief, Medtronic knew of the applications that resulted in the '573 Patent by way of the agreement and business relationship with Medcanica, as discussed above.  On information and belief, around 2001 Medtronic had access to and analyzed the '573 Patent while it was a pending application.  Medtronic had this knowledge before designing, marketing, using, and selling the infringing devices, such as the Accused Devices.  Around 2004, Medtronic again had access to the '573 Patent, now as an issued patent rather than pending application, through the contacts described above.  On information and belief, Medtronic's knowledge of the patent application and the '573 Patent put Medtronic on notice that the Accused Devices infringed the '573 Patent.  With the prior relationship between Medtronic and

Medcanica as described above, and Medtronic's knowledge of the '573 Patent, Medtronic's infringement was and continues to be objectively reckless.

36. Additionally during the 2010 time period while Medcanica was exploring different business options, Plaintiff believes that Medtronic was contacted again. During this time period, Medcanica was working with ICAP Ocean Tomo to explore ways to monetize Medcanica's intellectual property. Upon information and belief, ICAP Ocean Tomo contacted Medtronic to inform it that Medcanica's intellectual property—including the '573 Patent—might be available for purchase. Plaintiff contends that this contact by ICAP Ocean Tomo further informed Medtronic of the '573 Patent and put Medtronic on notice that the Accused Devices infringed the '573 Patent. With Medtronic's knowledge of the '573 Patent, Medtronic's infringement was and continues to be objectively reckless.

37. To the extent that Medtronic continues to make, use, sell, offer to sell, and/or import the Accused Devices after the filing of this lawsuit, each instance of these actions is an act of willful infringement by Medtronic for which Alisanos should be justly compensated.

38. Thus, Medtronic has disregarded and continues to disregard an objectively high likelihood that its actions constitute infringement of the '573 Patent. The objectively-defined risk has been known or is so obvious that it should have been known to Medtronic. Medtronic's willful infringement of the '573 Patent has caused substantial damage to Alisanos.

## COUNT III

### MEDTRONIC'S CONTRIBUTORY INFRINGEMENT

39. Alisanos incorporates and realleges the allegations contained in paragraphs 1 through 38 above as if fully set forth herein.

40. Defendant Medtronic has and continues to contributorily infringe (literally and/or under the doctrine of equivalents) one or more claims of the '573 Patent by, without limitation, providing, selling, and/or offering to sell the Accused Devices. The Accused Devices are not staple articles of commerce and have no substantial non-infringing uses. Medtronic's actions contribute to the direct infringement of the '573 Patent by consumers, businesses, distributors, resellers, sales representatives, hospitals, medical institutions, group purchasing organizations, physicians, and medical professionals that use, sell, offer to sell, and/or import within the United States the Accused Devices. Medtronic's contributory infringement of the Patents-in-Suit is willful, as described above, and has caused substantial damage to Alisanos. Medtronic's infringing activities violate 35 U.S.C. § 271.

## COUNT IV

## DEFENDANTS' INDUCEMENT OF INFRINGEMENT

41. Alisanos incorporates and realleges the allegations contained in paragraphs 1 through 40 above as if fully set forth herein.

42. Defendant Medtronic has and continues to induce infringement (literally and/or under the doctrine of equivalents) of one or more claims of the '573 Patent. Medtronic's deliberate actions include, but are not limited to, actively marketing to, encouraging use by, and instructing consumers, businesses, distributors, resellers, sales representatives, hospitals, medical institutions, group purchasing organizations, physicians, and medical professionals about how to use, promote, market, distribute, or sell the Accused Devices. These actions, individually and collectively, have induced and continue to induce the direct infringement of the '573 Patent by consumers, businesses, distributors, resellers, sales representatives, hospitals, medical institutions, group purchasing organizations, physicians, and medical professionals. Medtronic's

inducement of infringement of the '573 Patent is willful as described above and has caused substantial damage to Alisanos. Medtronic's infringing activities violate 35 U.S.C. § 271.

## DAMAGES

43. Alisanos incorporates and realleges the allegations contained in paragraphs 1 through 42 above as if fully set forth herein.

44. Medtronic's acts of infringement have caused substantial damage to Alisanos. As a direct and proximate consequence of Medtronic's unlawful acts and practices, Alisanos has been, is being, and will continue to be injured in its business and property rights, and has suffered, is suffering, and will continue to suffer injury and damages for which it is entitled to relief under 35 U.S.C. § 284.

45. Medtronic is liable to Alisanos for such infringement, and as a result, Alisanos seeks recovery of the following damages:

   a. Alisanos seeks damages to adequately compensate it for Medtronic's infringement of the '573 Patent. Such damages should be no less than the amount of a reasonable royalty under 35 U.S.C. § 284.

   b. Based on information and belief, Alisanos contends that Medtronic's acts of infringement have been and are willful, as described in the preceding paragraphs. Therefore, under 35 U.S.C. § 284, Alisanos seeks a finding of willfulness and recovery of enhanced damages up to three times the amount of damages found by the trier of fact. Alisanos further seeks recovery of its reasonable attorneys' fees and expenses under 35 U.S.C. § 285. Alisanos further seeks pre-judgment and post-judgment interest at the maximum rate permitted by law.

## PRAYER FOR RELIEF

46. Alisanos is entitled to and pray for relief on all claims as follows:

   a. A judgment that the '573 Patent is infringed, directly and/or indirectly, either literally and/or under the doctrine of equivalents, by Medtronic;

   b. A judgment and order requiring Medtronic to pay Alisanos all damages adequate to compensate for Medtronic's infringement of the '573 Patent under 35 U.S.C. § 284, and in no event less than a reasonable royalty. Such damages shall include treble damages for willful infringement as provided by 35 U.S.C. § 284, and supplemental damages for any continuing post-verdict infringement up until entry of the final Judgment with an accounting as needed;

   c. A judgment and order requiring Medtronic to pay Alisanos pre-judgment and post-judgment interest at the maximum rate permitted by law on the damages awarded;

   d. A judgment and order finding this case to be an exceptional case and requiring Medtronic to pay the costs of this action (including all disbursements) and attorneys' fees as provided by 35 U.S.C. § 285; and

   e. Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

47. Alisanos hereby request a trial by jury on each claim for relief alleged in this Complaint.

          Respectfully submitted,

          **/s/Carl R. Nelson**
          **CARL R. NELSON**
          FLORIDA BAR NO: 0280186
          **SCOTT A. RICHARDS**
          FLORIDA BAR NO: 0072657
          **FOWLER WHITE BOGGS P.A.**
          501 E. KENNEDY BLVD.
          SUITE 1700
          TAMPA, FL 33602
          813-228-7411 (TELEPHONE)
          813-229-8313 (FACSIMILE)
          cnelson@fowlerwhite.com

          **TERRENCE RUSSELL**
          FLORIDA BAR NO: 116057
          **FOWLER WHITE BOGGS P.A.**
          1200 EAST LAS OLAS BLVD.
          SUITE 500
          FORT LAUDERDALE, FL 33301
          954-703-3929 (TELEPHONE)
          954-703-3939 (FACSIMILE)
          terrence.russell@fowlerwhite.com

          **DRAKE MARTIN**
          FLORIDA STATE BAR NO. 90479
          **NIX PATTERSON & ROACH LLP**
          170 East Scenic Highway 30A, Suite 101
          Santa Rosa Beach FL 32459
          850.231.4028 (telephone)
          850.231.2972 (facsimile)
          drakemartin@nixlawfirm.com

**OF COUNSEL**

**DEREK GILLILAND**
TEXAS STATE BAR NO. 24007239
**NIX PATTERSON & ROACH, L.L.P.**
205 Linda Drive
Daingerfield, Texas 75638
903.645.7333 (telephone)
903.645.5389 (facsimile)
dgilliland@nixlawfirm.com

**EDWARD CHIN**
TEXAS STATE BAR NO. 50511688
**ANDREW J. WRIGHT**
TEXAS STATE BAR NO. 24063927
**KIRK VOSS**
TEXAS STATE BAR NO. 24075229
**NIX PATTERSON & ROACH, L.L.P.**
5215 N. O'Connor Blvd., Suite 1900
Irving, Texas 75039
972.831.1188 (telephone)
972.444.0716 (facsimile)
edchin@me.com
andrewjwright@me.com
kirkvoss@me.com

\* - Motions to Appear *Pro Hac Vice* to be filed

                       **ATTORNEYS FOR PLAINTIFF**
                       **ALISANOS LLC**